# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**COURTLAND BISHOP, et al.,**

        **Plaintiffs,**                 **Case No. 2:08-cv-766**
                                    **JUDGE GREGORY L. FROST**
      **v.**                           **Magistrate Judge Mark R. Abel**

**THE CHILDREN'S CENTER FOR**
**DEVELOPMENTAL ENRICHMENT, et al.,**

        **Defendants.**

## OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment on Plaintiffs' First and Second Causes of Action ("Defendants' Second Motion for Summary Judgment") (ECF No. 53), Plaintiffs' Response in Opposition to Defendants' Second Motion for Summary Judgment (ECF No. 54), and Defendants' Reply to Plaintiffs' Response in Opposition to Defendants' Second Motion for Summary Judgment (ECF No. 57). For the reasons the follow, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion.

## I. Background

### A. Facts

Plaintiffs Courtland and Michelle Bishop and their minor son C.B. reside in the Worthington, Ohio School District ("Worthington Schools"). In 2002 Worthington Schools placed C.B. at Oakstone Academy ("Oakstone") after he was identified as a child with disabilities under the Individuals with Disabilities Education Improvement Act ("IDEIA"),[1] 20

---

[1] In 2004, Congress re-authorized the Individuals with Disabilities Education Act ("IDEA") as the IDEIA. *See* Pub. L. No. 108-446, 118 Stat. 2647 (Dec. 3, 2004), effective July

U.S.C. § 1400 *et seq.*  Oakstone is a school that educates autistic children in an environment with typically developing children.  C.B.'s typically developing twin was also enrolled at Oakstone.

Defendant the Children's Center for Developmental Enrichment ("CCDE") is a private, non-profit corporation that is organized under Ohio law for charitable and educational purposes. CCDE operates Oakstone.  Rebecca Morrison, Ph.D., is CCDE's Chief Executive Officer ("CEO") and is named as a defendant in this action in her individual and official capacities.

Oakstone provided educational services to C.B. pursuant to his Individualized Education Plan ("IEP") until August 2005.  On August 29, 2005, the first day of school for the 2005-2006 school year, the Bishops accompanied C.B. to CCDE.  When the Bishops discovered that C.B. had been placed in an all-day preschool class they refused to allow C.B. to stay in that classroom.  The Bishops believed that the classroom assignment was not in compliance with C.B.'s IEP.  The Bishops were upset and Mr. Bishop used foul language to express his feelings about the placement.  CEO Morrison was attending to a family emergency that day and was not present at the school.  CCDE Administrator Nanci Morris suggested that the Bishops take C.B. home and wait for Morrison to call.  The Bishops followed Morris' suggestion.  On August 31, 2005, Morrison left a telephone message at the Bishop's home stating that C.B. "does not have a placement at Oakstone preschool [and] has been referred back to the [Worthington School] district[.]"  (ECF No. 42-1 at 40.)

The parties disagree as to the ramifications of these occurrences.  The Bishops contend that Morrison expelled C.B. after the Bishops refused to place C.B. in a classroom that was not

---

1, 2005. Throughout this Opinion and Order, statutory references will be to the IDEIA, except when quoted as the IDEA in opinions cited by this Court.

in compliance with C.B.'s IEP.  Defendants claim that C.B.'s classroom assignment was in compliance with the IEP, and when the Bishops refused to place C.B. in that classroom they effectively withdrew C.B. from CCDE.

**B.  Procedural History**

On October 25, 2005, the Bishops filed a Complaint Notice and Request for Due Process Hearing with the Ohio Department of Education regarding what they believe was C.B.'s expulsion from Oakstone.  Prior to the hearing, the Bishops withdrew this complaint and hearing request.

On May 30, 2006, the Bishops, individually and as next friends of C.B., filed an action in this Division of this District, Case No. 06-cv-404 ("*Bishop I*"), alleging that, as a result of C.B.'s expulsion from Oakstone, Worthington Schools, the Ohio Department of Education, and CCDE violated: (1) Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act or Section 504"); (2) the Americans with Disabilities Act of 1991, 42 U.S.C. § 12131 ("ADA"); (3) the IDEIA; and, (4) the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983").  Plaintiffs also claimed that Defendants were liable for breach of contract and tortious interference with contract.  *Bishop I* was assigned to United States District Judge Algenon L. Marbley.  On March 5, 2007, Judge Marbley granted Defendants' motion to dismiss for Plaintiffs' failure to exhaust their available administrative remedies.

On August 14, 2007, after dismissal of *Bishop I*, the Bishops filed an administrative due process complaint against Worthington Schools, the Ohio Department of Education, and CCDE. CCDE challenged the sufficiency of the due process complaint.  The District Level Hearing Officer ("DLHO"), however, found the complaint sufficient on August 27, 2007.  CCDE then

3

moved for dismissal of the complaint for failure to state a claim upon which relief could be granted and for untimely or improper service. On October 16, 2007, the DLHO found service adequate, but concluded that the complaint against CCDE failed to state a claim upon which relief could be granted.

The Bishops requested state level review and CCDE filed its appeal/cross appeal of the decision denying CCDE's motion to dismiss for failure to provide legally required notice. These administrative appeals resulted in two decisions. In the first decision, the State Level Review Officer ("SLRO") denied the Bishops' appeal, affirming the dismissal of CCDE from the due process proceedings by "Final Decision and Entry" dated January 25, 2008. In the second decision, issued on March 17, 2008, the SLRO denied CCDE's appeal/cross appeal ("Final Decision and Entry as to CCDE"), which had the effect of finalizing the administrative process with regard to CCDE. *See CCDE v. Machle*, No. 2:08-cv-817, slip op. (S.D. Ohio March 6, 2009) (holding that the Final Decision and Entry as to CCDE was a final and appealable administrative decision). The administrative appeal process continued thereafter as to the Bishops and Worthington Schools. The administrative process culminated in a Final Decision and Entry issued on June 12, 2008.

On August 8, 2008, the Bishops, individually and as next of friends of C.B., filed the instant action alleging claims for relief under the Rehabilitation Act, Section 1983, the ADA, and Ohio law ("*Bishop II*"). On March 6, 2009, this Court granted summary judgment to CCDE in *Bishop II*. (ECF No. 16.) The Court determined that Plaintiffs' federal law claims were subject to a two-year statute of limitations period and that Plaintiffs' claims for relief accrued on August 31, 2005, rendering them barred by the applicable statute of limitations. The Court declined to

exercise supplemental jurisdiction over Plaintiffs' state law claims.

On August 25, 2008, CCDE filed an action for attorney fees and for reversal of certain aspects of the Final Decision and Entry as to CCDE. *See CCDE v. Machle*, No. 2:08-cv-817. On March 6, 2009, this Court granted the defendants' motion to dismiss that action. *CCDE v. Machle*, No. 2:08-cv-817, slip op. (S.D. Ohio March 6, 2009) (ECF No. 33.) CCDE appealed that decision to the United States Court of Appeals for the Sixth Circuit on April 4, 2009. On July 19, 2010, the Sixth Circuit affirmed this Court's decision.

On April 2, 2009, Plaintiffs appealed *Bishop II* to the United States Court of Appeals for the Sixth Circuit. (ECF No. 18.) On August 26, 2010, the Sixth Circuit issued its decision in which it found that this Court correctly determined that "Plaintiffs had until August 31, 2007, to file their claims under the Rehabilitation Act or §1983, and the district court correctly concluded that the claim accrued and the statutory period began running on August 31, 2005." *Bishop v. Children's Ctr. for Developmental Enrichment*, 618 F.3d 533, 537 (6th Cir. 2010). The court, however, concluded that Plaintiffs' federal law claims were not barred by the statute of limitations because they were subject to minority tolling. *Id.* The Sixth Circuit, therefore, reversed and remanded the federal law claims and also determined that, "[s]ince the district court will once again have federal claims before it, we remand the state law claims to the district court to allow it to determine whether to exercise supplemental jurisdiction in light of this change in circumstances." *Id.* at 538.

On October 15, 2010, the Sixth Circuit issued its mandate in *Bishop II*. (ECF No. 26.) Thereafter, this Court conducted a status conference on October 26, 2010.

On October 26, 2010, the Court issued an order memorializing the status conference and

indicating that "[a]ll parties were represented and agreed to" the schedule setting forth discovery

and dispositive motions deadlines, the final pretrial conference, and the trial.  (ECF No. 30.)

Although the agreed scheduling order established April 21, 2011 as the date to file dispositive

motions, Defendants filed a motion for summary judgment on Plaintiffs' two state law claims on

January 16, 2011 ("Defendants' First Motion for Summary Judgment").  (ECF No. 42.)  On

August 8, 2011, this Court granted Defendants' motion as it related to Plaintiffs' tortious

interference with contract claim and denied the motion as it related to Plaintiffs' breach of

contract claim.  (ECF No. 55.)  On August 18, 2011, Defendants filed a motion to reconsider that

decision (ECF No. 59), which is scheduled for a non-oral hearing on October 7, 2011 (ECF No.

60).

Defendants timely filed Defendants' Second Motion for Summary Judgment, in which it

moved for judgment as a matter of law on the remaining federal claims that are before the Court.

That motion is ripe for review.

## II.  Standard

Summary judgment is appropriate "if the movant shows that there is no genuine issue as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).  The Court may therefore grant a motion for summary judgment if the nonmoving party

who has the burden of proof at trial fails to make a showing sufficient to establish the existence

of an element that is essential to that party's case.  *See Muncie Power Prods., Inc. v. United

Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing Celotex Corp. v. Catrett, 477 U.S.

317, 322 (1986)).

The "party seeking summary judgment always bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie Power Prods., Inc.*, 328 F.3d at 873 (quoting *Anderson*, 477 U.S. at 248). *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts"). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234-35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52).

### III. Discussion

Plaintiffs contend that C.B.'s expulsion from CCDE without notice or consultation, while not expelling his typically developing twin, constituted a denial of due process and a violation of C.B.'s right as a student with disabilities to be free from discrimination on the basis of his disabilities and his right to a free and appropriate public education ("FAPE"). Defendants have moved for summary judgment on all of these claims.

**A.  Section 504 of the Rehabilitation Act**

Section 504 of the Rehabilitation Act provides:  "No otherwise qualified individual with a disability in the United States, as defined in section 7(20) [29 U.S.C.S. § 705(20)], shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a) (bracket in original).  Plaintiffs assert that C.B.'s autism was the sole reason he was expelled from Oakstone and that the expulsion, therefore, constituted disability discrimination and denial of a FAPE.  Defendants argue that they are entitled to summary judgment on Plaintiffs' claims and that, even if Plaintiffs' Section 504 claims survive, Plaintiffs are not entitled to compensatory or punitive damages.

**1.  *Prima Facie* Case of Discrimination**

A claim for relief under Section 504 comprises four elements:

(1) The plaintiff is a "[disabled] person" under the Act; (2) The plaintiff is "otherwise qualified" for participation in the program; (3) The plaintiff is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely by reason of his [disability]; and  (4) The relevant program or activity is receiving Federal financial assistance.

*Sandison v. Michigan High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1030-31 (6th Cir. 1995)

(quoting *Doherty v. Southern College of Optometry*, 862 F.2d 570, 573 (6th Cir. 1988)).

Defendants do not dispute that C.B. is disabled.

**a.  Otherwise Qualified - Contract**

With regard to the second element of Plaintiffs' *prima facie* case, Defendants argue that:

As is discussed in Defendants' pending motion for summary judgment on Plaintiffs' state law claims, R. 42, Mot. S.J., incorporated herein by reference pursuant to FRCP 10(c), the Worthington School District failed to accept CCDE's offer to place C.B. and failed to provide consideration.  There having been no contract, C.B. was not

"otherwise qualified" as a student at CCDE's private school.

(ECF No. 53 at 6.)

However, as this Court explained in detail in its decision on Defendants' First Motion for

Summary Judgment, which the Court hereby incorporates in its entirety, a contract was formed

between Worthington Schools and CCDE for the education of C.B.  Thus, to the extent that lack

of a contract prevents C.B. from being "otherwise qualified," that argument fails.

### b.  Otherwise Qualified and Solely by Reason of Disability - Expulsion or Withdraw

As to the second and third elements of Plaintiffs' *prima facie* case, Defendants argue:

> C.B. was not "otherwise qualified" because his parents refused to allow him to attend
> the school.  Like the child whose parents do not consent to treatment, a child whose
> parents refuse the educational placement is not "otherwise qualified."  *Bowen v.
> American Hospital Assoc.*, 476 U.S., 610, 630 (1986).  His parents having rejected
> the school and the placement offered by CCDE in conformity with the contract
> offered to Worthington and the terms of the IEP, C.B. was not excluded "solely by
> reason of his handicap" nor was he "otherwise qualified."[2]  *Id.*

(ECF No. 53 at 7.)

Defendants further argue that the facts "show that C.B. was withdrawn from the school

purely and only due to his parents' decision[, not based upon his autism]."  (ECF No. 53).

Finally, Defendants contend:

> The process due a parent withdrawing a child from a private or public school can be
> nothing more than ready access to the child if the child is in the school's custody at
> the time of withdrawal.  In this matter, the child C.B. never left his parents' custody
> or control.  Plaintiffs fail to allege facts showing a denial of any process they believe

---

[2]Defendants extrapolate their argument from the *Bowen* Court's statement: "A hospital's
withholding of treatment when no parental consent has been given cannot violate §504, for
without the consent of the parents or a surrogate decisionmaker the infant is neither 'otherwise
qualified' for treatment nor has he been denied care 'solely by reason of his handicap.' "  *Bowen*,
476 U.S. at 630.

they were due or how the denial of it violated §504.

(ECF No. 53 at 10.)

All of Defendants' arguments are based upon a flawed premise: That the Bishops withdrew C.B. from CCDE. As this Court explained in detail in its Opinion and Order on Defendants' First Motion for Summary Judgment, that fact is material and it is in dispute. Plaintiffs provide evidence showing that C.B. was expelled from Oakstone and Defendants provide evidence that the Bishops withdrew C.B. from Oakstone. Thus, to the extent that withdrawing C.B. from Oakstone prevents him from being "otherwise qualified" or excluded "solely by reason of his disability" under the Rehabilitation Act, there is a genuine issue of material fact that prevents judgment as a matter of law.

### c. Solely by Reason of Disability - Autism

As evidence that C.B. was expelled from CCDE solely by reason of his disability, Plaintiffs argue:

> Because the minor plaintiff was expelled, but his twin brother was not, the jury could reasonably conclude that the expulsion was based upon his disability. Indeed, there is no other plausible reason. As repeatedly mentioned by Defendants, Mr. Bishop yelled and cursed – if this conduct was the basis for expulsion, why only the child with autism?

(ECF No. 54 at 5.)  Further, Plaintiffs contend:

> A reasonable conclusion would be that Oakstone valued the neurotypical son's presence in their program as a peer model, but chose to expel the autistic son precisely because he was autistic and could easily be replaced from Oakstone's waiting list. There is an issue of material fact, therefore, as to whether CCDE and Rebecca Morrison intentionally discriminated against the minor plaintiff.

(ECF No. 54 at 7.)

In their reply memorandum, Defendants argue that this evidence does not support

10

Plaintiffs' argument:

> Even if, and assuming *arguendo* that, one could find any hint of discrimination in the fact that the Bishops withdrew their two different children on two different days, the facts not in dispute overwhelmingly demonstrate that other factors were the primary reasons that C.B. stopped attending Oakstone.  First and foremost is the fact that the Bishops withdrew C.B. from the school.  Second, a contract was not in place and no tuition was paid.  Third, CCDE understood that the Bishops withdrew C.B.

(ECF No. 57 at 18.)  Defendants arguments are not well taken.

As the Court just explained *supra*, it has already determined that a contract existed and that there is a genuine issue of material fact as to whether C.B. was expelled or was withdrawn from Oakstone.  That decision was issued before Defendants filed their reply from which the above quote was taken.  Defendants cannot rely upon these propositions as if the Court has not already ruled upon them.

Viewing all evidence in the light most favorable to Plaintiffs, a justifiable inference can be made that Defendants expelled C.B. solely because of his disability.  The weight to be given to this evidence is a matter for the jury, not this Court.  Thus, the Court concludes that Plaintiffs have raised a genuine issue of material fact as to whether C.B. was expelled based solely upon his disability.  If the jury finds Defendants' version of the facts believable, *i.e.*, that C.B. was voluntarily withdrawn from Oakstone by his parents, this claim cannot survive.  If, however, the jury determines that C.B. was expelled from Oakstone, then Plaintiffs must show that the expulsion was based solely upon C.B.'s disability.

### d.  Federal financial assistance

As support for the fourth element of their *prima facie* case, Plaintiffs argue that CCDE is the recipient of federal financial assistance because, *inter alia*, it participates in two federal grant research projects, one through the Ohio State University and one through the University of

Washington.[3]  Contrarily, Defendants argue that CCDE was not a "recipient" of federal aid nor

did it receive "assistance" in the form of federal financial aid.  Defendants' arguments are not

well taken.[4]

Defendants first argue that CCDE is not a recipient of federal financial aid because it was

merely a "partner" participant under 20 U.S.C. §1452(b)(2) and " 'partners' are not intended to

become public by virtue of their participation nor are they to become subject to § 504."  (ECF

No. 53 at 15.)  However, as Plaintiffs correctly point out, CCDE cannot be considered a

"partner" under 20 U.S.C. § 1452(b)(2) because the grants under which they subcontracted were

not made to a "State educational agency."  *Id.* ("Eligible applicants. A State educational agency

may apply for a grant under this subpart").  Grants to institutions of higher education for "model

demonstration projects" and "personnel preparation" are governed by 20 U.S.C. §§ 1461-1466

---

[3]Although not relevant for the purpose of determining whether CCDE received federal financial assistance, the Court notes that as part of the subcontract with the University of Washington, CCDE agreed to comply with the ADA and the Rehabilitation Act in exchange for grant funding:

XI. NONDISCRIMINATION

By acceptance of this Subcontract, Contractor agrees that it will comply with Title VI of the Civil Rights Act of 1964, as amended, Title IX of the Education Amendments of 1972, as amended, Section 504 of the Rehabilitation Act of 1973, as amended, Age Discrimination Act of 1975, as amended, and the Americans with Disabilities Act of 1990.

(ECF No. 54 at 20, Ex. G, ¶ XI).

[4]Defendants also argue that acceptance of tuition payments from school districts, such as Worthington Schools, that receive federal financial assistance does not make CCDE a recipient of federal financial assistance.  The Court finds it unnecessary to reach this argument because of its conclusion that CCDE is a recipient of federal financial assistance based on its participation in two federal grant research projects.

which make no mention of "partners."  20 U.S.C. § 1461(b)(1) (including "an institution of

higher education" as an "eligible entity" for "subpart 20 U.S.C. §§ 1461 *et seq*.").  There is no

dispute that the Ohio State University grant was a model demonstration project and the

University of Washington grant was for personnel preparation.

   Defendants next argue that it is not a recipient of federal financial assistance because the

United States Department of Education, the grantor, identifies the recipients of the grants as the

Ohio State University and the University of Washington and CCDE is only a subcontractor on

each.  Plaintiffs, however, correctly point out that this interpretation is contrary to the definitions

found in the regulations promulgated under Section 504 of the Rehabilitation Act.  Those

regulations contemplate Section 504's applicability to subcontractors of a recipient of federal

grant funds and make them applicable to an entire corporation engaged in the business of

providing education, such as CCDE.  The regulations in relevant part provide:

> (f) Recipient means any state or its political subdivision, any instrumentality of a state or its political subdivision, any public or private agency, institution, organization, or other entity, or any person *to which Federal financial assistance is extended directly or through another recipient*, including any successor, assignee, or transferee of a recipient, but excluding the ultimate beneficiary of the assistance. . . . .

> (h) *Federal financial assistance means any grant*, loan, contract (other than a procurement contract or a contract of insurance or guaranty), or any other arrangement by which the Department provides or otherwise *makes available assistance in the form of*:

>    (1) *Funds*;
> . . . .

> (k) Program or activity means all of the operations of--

>    (3)(i) An entire corporation, partnership, or other private organization, or an entire sole proprietorship-- . . .

> (B) Which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation;

34 C.F.R. 104.3(f), (h), (k) (emphases added).

CCDE cites several cases as support for its position that the funds it received through the Ohio State University and the University of Washington did not constitute federal financial assistance:

> Although the question of what constitutes assistance is not often addressed, those courts that have addressed the question have found that it is more than reimbursement or simple receipt of federal money under a contract. "Coverage under the act does not follow the federal funding past the original intended recipient to those entities which merely derived some benefit from the aid or received compensation for services rendered pursuant to a contract." *Grzan v. Charter Hosp. of Northwest Ind.*, 104 F.3d 116, 120 (7th Cir. 1997); *Gallagher v. Croghan Colonial Bank*, 89 F.3d 275, 278 (6th Cir. 1996). Generally, receipt of federal money, whether direct or indirect, will incur Rehabilitation Act liability only if the funding "is in some form of a subsidy." *DeVargas v. Mason & Hanger-Silas Mason Co.*, 911 F.2d 1377, 1382 (10th Cir. 1990). The two research grants in which CCDE participated in no way subsidized the organization's programming or functions. The University of Washington research took place in various locations throughout the United States, not at CCDE. And, as a participant in the OSU research project, CCDE contributed twenty thousand dollars as well as in kind services to the research study. Ex. H. The project was a net financial loss rather than a subsidy or assistance.

(ECF No. 53 at 15-16.) Even accepting Defendants' factual allegations as true, the cases upon which Defendants rely are inapposite.

*Grzan v. Charter Hosp. of Northwest Ind.*, involved a Section 504 suit by a psychiatric patient against a hospital and an individual counselor arising out of an allegation that the counselor had engaged in sexual relations with the patient-plaintiff. The hospital conceded that it was the recipient of federal funds. A motion by both defendants to dismiss was granted, followed by appeal. The United States Court of Appeals for the Seventh Circuit found that the

14

*individual counselor* was not a recipient of federal funds, noting that "[e]mployees of the recipients of federal financial assistance are not in themselves the recipients of such assistance." *Id.* at 120. CCDE directly received federal funds through its subcontracts with the Ohio State University and the University of Washington; it did not merely "receive compensation" or a "benefit" from payments made to the two universities as those terms have been interpreted.

In *Gallagher v. Croghan Colonial Bank*, the plaintiff claimed that Croghan Bank was the recipient of federal aid for the purposes of the Rehabilitation Act because it made student loans which were subsidized and guaranteed with federal funds. Noting that the relevant regulations, (now found at 34 C.F.R. § 104.3(h)) specifically excluded contracts of insurance or guaranty, the United States Court of Appeals for the Sixth Circuit found that the defendant bank did not receive federal financial assistance under Section 504. There are no issues of guaranty or insurance in the present case. And, unlike the regulation's specific exclusion of contracts of insurance or guaranty, the regulations specifically *include* grants.

As for *DeVargas v. Mason & Hanger-Silas Mason Co.*, the plaintiff in that case was denied employment as a security inspector at the Los Alamos National Laboratory because a then-applicable Department of Energy Interim Management Directive medically disqualified a one-eyed individual. The plaintiff sued for discrimination under Section 504. The United States Court of Appeals for the Tenth Circuit affirmed the dismissal of the defendant company on the basis that its receipt of federal funds was pursuant to a procurement contract which, like contracts of insurance or guaranty, is specifically exempted from the definition of "federal financial aid" in the Rehabilitation Act.

Defendants last argument is that it did not receive "assistance" in the form of federal

15

financial aid based on the dictionary definition of the word "assistance."  Defendants rely on the canons of statutory interpretation to conclude that this Court should give the word "assistance" its common and ordinary meaning found in the dictionary, *i.e.,* "to give help; aid."  Under that definition, Defendants argue, "CCDE received no assistance by participating in the two research projects" and instead assisted the Ohio State University and the University of Washington in their research projects.  (ECF No. 53 at 16.)

This Court, however, will not rely upon the definition of "assistance" found in the dictionary in determining whether CCDE received federal funds when that term is specifically defined at 34 C.F.R. § 104.3 and the grant funds received by CCDE fall squarely within that definition: "Federal financial assistance means any grant" that "makes available assistance in the form of . . . Funds" that are "extended directly or through another recipient ").  34 C.F.R. § 104.3(f), (h).  Defendants do not dispute that the University of Washington and the Ohio State University provided funds to CCDE from federal grants that were made to the universities. (ECF No. 54-2) ("Subcontract between Oakstone Academy . . . and The Ohio State University Research Foundation" . . . "additional funds in the amount of $72,785.00" are provided to Oakstone); (ECF No. 54-3) (Oakstone's 2006 audit shows the 2006 non-operating revenue received from federal and state grants at $333,969 and that "The School is reliant upon . . . Federal Grants to offer quality, educational services to students.")

The evidence before the Court is more than sufficient to establish that CCDE received federal financial assistance as that term is defined under the Rehabilitation Act,

### e.  Conclusion - *Prima facie* case

The Court concludes that Plaintiffs have established that CCDE is a recipient of federal

financial assistance and that Plaintiffs have raised genuine issues of material fact as to whether C.B. was "otherwise qualified" for the program and whether C.B. was discriminated against "solely by reason of disability." Consequently, the Court **DENIES** Defendants' Second Motion for Summary Judgment as it relates to Plaintiffs' Section 504 Rehabilitation Act claim based upon disability discrimination.

### 2. Rehabilitation Act Violation Based Upon Denial of a FAPE

Plaintiffs assert that C.B.'s expulsion from Oakstone based on his autism denied him a FAPE, (*i.e.*, a free and appropriate public education) which violates Section 504 of the Rehabilitation Act. Defendants argue that this claim is barred by the doctrine of *res judicata*, and that even if it were not, it cannot survive summary judgment.

### a. *Res judicata*

Defendants make three arguments as support for their proposition that Plaintiffs' denial of a FAPE claim is barred by the doctrine of *res judicata*. First, Defendants posit that at the state administrative proceedings it was conclusively determined that CCDE was not responsible for providing C.B. a FAPE under Section 504 or under the IDEIA, therefore, "[t]his Court is without jurisdiction of this issue for the reason that it was decided in the administrative proceedings below and Plaintiffs did not appeal the ruling." (ECF No. 53 at 13) (relying on *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966) ("When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose.")). Plaintiffs do not argue that Defendants' proposition is based upon resolution of a disputed issue of law, not fact, and instead contend that the administrative hearing

only disposed of the FAPE issue filed under the IDEIA and not under Section 504.  This Court agrees.

In the administrative decision, the hearing officer cited to the fact that Plaintiffs filed claims under both the IDEIA and Section 504 in the federal civil action (*i.e.*, *Bishop I*) and that Plaintiffs argued that CCDE's actions violated these two statutes, as well as Section 1983, in their request for a due process hearing.  The hearing officer, however, reviewed and disposed only of the claim under the IDEIA:

> This appeal presents issues arising from the federal statute promoting the access of students with disabilities to educational opportunities, the Individuals with Disabilities Improvement Education Act ("IDEA"), 20 U.S.C. §1400 *et seq*.  The IDEA's purpose is to "assure that all handicapped children have available to them . . . a free appropriate public education (FAPE) that emphasizes special education and related services designed to meet their unique needs . . . ." 20 U.S.C. § 1400(c). Under the IDEA, a FAPE is one that is "provided in conformity with the individualized education program required under §1414(d) of this title." 20 U.S.C. § 1412(a)(l)(A).

(ECF No. 12-5 at 7.) The officer concluded that, "private schools, such as Oakstone, are not subject to liability under IDEA because the statutes (federal and state) have not so provided.  The local educational agency is the appropriate target of a claim under IDEA."  (ECF No. 12-6 at 11-12.)

Defendants next argue that case law and the regulations support the proposition that all Section 504 claims are resolved by IDEIA administrative hearings, citing to *N.L. v. Knox County Schools*, 315 F.3d 688 (6th Cir. 2003), *Seladoki v. Bellaire Local Sch. Dist.*, No. C2-07-1272, 2009 WL 4884199 (S.D. Ohio Dec. 14, 2009), 45 C.F.R. 84.36, and 34 CFR 104.36. Defendants' arguments are not well taken.

With regard to the case law, Defendants rely on *N.L. v. Knox County Schools* and

18

*Seladoki v. Bellaire Local Sch. Dist.*, claiming that they stand for the proposition that all Section

504 claims are resolved by IDEIA administrative proceedings.  As Plaintiffs correctly argue,

these cases were filed against public schools subject to liability for deprivation of a FAPE under

both the IDIEA and Section 504.  They did not involve issues concerning a private school found

not subject to IDIEA, but, like CCDE, subject to Section 504 due to its receipt of federal

financial aid.  The relief sought against CCDE by Plaintiffs under Section 504 is not also

available to them under IDEA.  As our sister district court has recently observed:

> A principal difference between section 504 and the IDEA relates to the specific
> students covered by the statutes. . .  Furthermore, although both statutes require the
> state to provide students with a FAPE, the requirements are not identical.  As the
> Ninth Circuit recently noted, "FAPE under the IDEA and FAPE as defined in the
> section 504 regulations are similar but not identical."  *Mark H. v. Lemahieu*, 513
> F.3d 922, 933 (9th Cir. 2008).

*B.H. v. Portage Pub. Sch. Bd. of Educ.*, No. 1:08-cv-293, 2009 U.S. Dist. LEXIS 7604, at *18

(W.D. Mi. Feb. 2, 2009).  This Court agrees with the *B.H.* court's analysis.  The rights and

protections provided by the IDEIA and Section 504, while overlapping, are not identical.

Simply because Worthington Schools were required to provide C.B. with certain rights under the

IDEIA does not meant that C.B. is not entitled to a FAPE from an entity subject to Section 504,

such as CCDE.

As to the regulations, (which both contain identical language), they do not provide

authority that Section 504 claims are necessarily resolved in IDEA proceedings.  These

regulations outline the type of procedural safeguards that a recipient of federal funds should have

in place.  They do not indicate that all Section 504 claims are resolved in an IDEIA due process

hearing.

Finally, Defendants argue that Plaintiffs stipulated to their Rehabilitation Act claim

19

being resolved by the IDEIA administrative proceedings. The stipulation to which Defendants refer was one between the Bishops and Worthington Schools and does not preclude this action against CCDE. CCDE was not a party to the stipulation or the due process hearing in which it arose. The stipulation that the due process hearing between the Bishops and Worthington Schools would cover only those Section 504 claims that were necessarily included in the IDEIA claims against Worthington cannot be deemed to encompass all of C.B.'s Section 504 claims against any party, particularly a party not subject to the IDEIA such as CCDE.

Accordingly, the Court **DENIES** Defendants' Second Motion for Summary Judgment as it relates to their argument that Plaintiffs' Rehabilitation Act claim based upon Oakstone's alleged denial of a FAPE to C.B. is *res judicata*.

### b. Denial of a FAPE

Defendants argue that "[e]stablishing discrimination based on a denial of FAPE under § 504 requires that 'either bad faith or gross misjudgment must be shown before a § 504 violation can be made out, at least in the context of education of handicapped children.' " (ECF No. 53 at 10-11) (citing to, *inter alia*, *Campbell v. Bd. of Educ.*, 58 Fed. App'x 162, 167 (6th Cir. 2003) (quoting *Monahan v. Nebraska*, 687 F.2d 1164, 1171 (8th Cir. 1982))). Under this standard, inadvertence or mistake is insufficient. Plaintiffs disagree and contend that the proper standard in this context is the "deliberate indifference" standard that was applied by the Sixth Circuit in *Hill v. Bradley*, 295 Fed. App'x 740 (6th Cir. 2008), a case against a school district filed under Section 504 and Section 1983. The Court, however, finds it unnecessary to determine which standard applies because even under the more stringent "bad faith or gross misjudgment" standard, Plaintiffs' claim survives summary judgment.

20

The merits of Plaintiffs' denial of a FAPE claim turns on the events surrounding C.B.'s withdraw/expulsion from Oakstone.  As this Court has explained several times in this Opinion and Order, how C.B. ended his education at Oakstone presents a genuine issue of material fact. Oakstone's Director Morris testified that she instructed the Bishops to take their son home and wait for a call from CEO Morrison.  The Bishops testified that at no time were they advised that doing so would be interpreted as withdrawing their son from Oakstone.  At this juncture, the Court must accept Plaintiffs' version of the facts as true and make all justifiable inferences in their favor.  If the Bishops were led to believe that Morrison would be calling to discuss C.B.'s placement and instead Morrison ignored this fact and filled C.B.'s highly sought-after placement at Oakstone, it would satisfy the type of bad faith, as opposed to mere professional misjudgment, that leads to liability under Section 504.

Accordingly, the Court **DENIES** Defendants' Second Motion for Summary Judgment as it relates to Plaintiffs' Rehabilitation Act claim based upon Oakstone's alleged denial of a FAPE to C.B.

### 3. Rehabilitation Act Claim - Damages

Plaintiffs have requested compensatory and punitive damages for violations of the Rehabilitation Act.  Defendants have asked for summary judgment on these damages claims.

#### a. Punitive Damages

Punitive damages are not available under Section 504 of the Rehabilitation Act.  *Moreno v. Consolidated Rail Corp.*, 99 F.3d. 782, 791-92 (6th Cir. 1996).  Consequently, the Court **GRANTS** Defendants' Motion for Summary Judgment as it relates to Plaintiffs' claim for punitive damages for alleged violations of Section 504 of the Rehabilitation Act.

21

### b. Compensatory Damages

Defendants argue that, "[i]n *Hill v. Bradley*, 295 Fed. Appx. 740, 742 n.2 (6th Cir. 2008), the United State Court of Appeals for the Sixth Circuit accepted without deciding that 'a showing of intent to discriminate is required under Section 504 when a plaintiff seeks damages.' " (ECF No. 53 at 12.)  Defendants conclude that "[i]t is apparent that proof of discriminatory intent is part and parcel of a § 504 claim for damages. . . . [and] Plaintiffs have failed to show that C.B.'s autism played any role in his departure from the school and have failed to allege any discriminatory intent."  *Id.*  Defendants' arguments are not well taken.

Defendants' arguments go to the standard to be applied to a determination of damages under Section 504, not to the availability of damages under that statute.  As to whether this issue will survive summary judgment, as the Court explained *supra*, Plaintiffs have submitted adequate evidence of discrimination to defeat Defendants' request for summary judgment as it relates to Plaintiffs' Rehabilitation Act claims.  If the jury determines that Plaintiffs have proven their Rehabilitation Act claims, it will then determine whether Plaintiffs are entitled to damages under the proper damages standard.[5]

---

[5]The Eighth Circuit this year explained:

All circuits to decide the question have held that to recover compensatory damages under either the ADA or the Rehabilitation Act, a plaintiff must establish that the agency's discrimination was intentional.  *See Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009) (Rehabilitation Act); *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 126 & n.20 (1st Cir. 2003) (ADA and Rehabilitation Act); *Delano-Pyle v. Victoria County*, 302 F.3d 567, 574 (5th Cir. 2002), *cert. denied*, 540 U.S. 810, 124 S. Ct. 47, 157 L. Ed. 2d 22 (2003) (same); *Garcia v. S.U.N.Y. Health Sci. Ctr. of Brooklyn*, 280 F.3d 98, 115 (2d Cir. 2001) (same); *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 & n.12 (9th Cir. 2001) (same); *Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 830 & n.9 (4th Cir. 1994) (Rehabilitation Act); *Wood v. President & Trs. of Spring Hill Coll.*, 978 F.2d 1214,

Thus, the Court **DENIES** Defendants' Motion for Summary Judgment as it relates to Plaintiffs' claim for compensatory damages for alleged violations of Section 504 of the Rehabilitation Act.

## B. Americans with Disabilities Act

The Americans with Disabilities Act applies to private entities that are public accommodations whose operations "affect commerce." 42 U.S.C. 12181(7). "Commerce" means travel, trade, traffic, commerce, transportation, or communications (a) among the several States; (b) between any foreign country or any territory or possession and any State; or (c) between points in the same State but through another State or foreign country." 42 U.S.C. 12181(1). Defendants argue, *inter alia*, that Plaintiffs rely only on one piece of evidence to support their claim that CCDE affects commerce and that the piece of evidence is inadmissible. This Court agrees.

Plaintiffs rely on a document titled "Federal Autism Activities," dated July 2006, that states that Oakstone is one of six institutions that make up the organization Professional Development in Autism and that this organization serves as a resource to educators and families throughout the country by providing training, workshops and in-depth information. Plaintiffs attached this document as Exhibit H to their memorandum in opposition to Defendants' Second

---

1219-20 (11th Cir. 1992) (same). Several other circuits, while not expressly deciding the question, have suggested or implied the same. *See Douris v. Office of Pa. Att'y Gen.*, 174 F. App'x 691, 693 (3d Cir. 2006); *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 561 (7th Cir. 1996); *Moreno v. Consol. Rail Corp.*, 99 F.3d 782, 791 (6th Cir. 1996) (en banc).

*Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011).

Motion for Summary Judgment.  That document, however, is unauthenticated and it is hearsay. *See* Fed. R. Evid. 801; Fed. R. Evid. 901.  Therefore, the document is inadmissible and cannot be considered on a motion for summary judgment.  *See* Fed. R. Civ. P. 56(c)(2).

Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment as it relates to Plaintiffs' claim under the ADA.

## C.  Section 1983

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988);  *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996).  Because Section 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under Section 1983 is to identify the specific constitutional right allegedly infringed.  *Albright v. Oliver*, 510 U.S. 266, 271 (1994).  Plaintiffs assert that C.B.'s placement in the pre-school classroom was a change from the agreed upon placement and that the change and subsequent expulsion were made without notice, consultation, or mediation with his parents, which is a violation of the Fourteenth Amendment to the United States Constitution.  The Fourteenth Amendment forbids a state from depriving any person of life, liberty, or property without due process of law.  U.S. Const. amend. XIV, § 1.

Initially, Defendants argue that they are entitled to summary judgment on this claim because Plaintiffs for the first time alleged that Defendants acted under color of state law in their memorandum in opposition to Defendants' Second Motion for Summary Judgment.  Defendants contend that they "are entitled to rely on Plaintiffs' characterization of their case in their

pleadings." (ECF No. 57 at 30.) Defendants' argument is not well taken.

Plaintiffs alleged a claim under Section 1983, which requires state action. It can be inferred from their amended complaint that they allege that CCDE is considered a state actor or they would not have alleged such a claim against CCDE. Plaintiffs need not use any magic words. The complaint is sufficient to put Defendants on notice that Plaintiffs believe that CCDE is a state actor for purposes of Section 1983. *See* Fed. R. Civ. P. 8(a)(2) (pleading must contain "a short plain statement of the claim showing that the pleader is entitled to relief").

Defendants next argue that they are entitled to summary judgment on this claim because they did not act under color of state law. This Court agrees.

It is undisputed that "Fourteenth Amendment protections, codified in 42 U.S.C. § 1983, are triggered only in the presence of state action and that a private entity acting on its own cannot deprive a citizen of [Fourteenth] Amendment rights." *Lansing v. City of Memphis*, 202 F.3d 821, 828 (6th Cir. 2000) (citing *Flagg Brothers Inc. v. Brooks*, 436 U.S. 149, 56 L. Ed. 2d 185, 98 S. Ct. 1729 (1978) ("most rights secured by the Constitution are protected only against infringement by governments"); *Hudgens v. NLRB*, 424 U.S. 507, 47 L. Ed. 2d 196, 96 S. Ct. 1029 (1976) ("It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state.")). "However, a private entity can be held to constitutional standards when its actions so approximate state action that they may be fairly attributed to the state." *Id.* The United States Court of Appeals for the Sixth Circuit explains:

> "The ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights 'fairly attributable to the State?' " *Rendell-Baker v. Kohn*, 457 U.S. 830, 838, 73 L. Ed. 2d 418, 102 S. Ct. 2764 (1982)

25

> (citation omitted).  Phrased another way, "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."  *Blum v. Yaretsky*, 457 U.S. 991, 1004, 73 L. Ed. 2d 534, 102 S. Ct. 2777 (1982).

*Adams v. Vandemark*, 855 F.2d 312, 314 (6th Cir. 1988) (holding private not-for-profit corporation was not a state actor, even though funded "almost entirely by public sources" and leasing office space from the city for a nominal fee).

The Supreme Court has used several theories, or tests, to determine whether an action was taken under color of state law or amounted to state action.  The two tests under which Plaintiffs argue are the "public function test" and the "symbiotic relationship" or "nexus" test.

### 1.  Public Functions Test

Plaintiffs contend that CCDE was employed by a public agency, Worthington Schools, to provide educational services to C.B.  In accepting the payment of funds earmarked for the education of children with disabilities proffered for those services, Plaintiffs argue, CCDE assumed the public function of Worthington Schools.  This Court disagrees.

The public function test requires that "the private entity exercise powers which are traditionally exclusively reserved to the state, such as holding elections or eminent domain." *Wolotsky*, 960 F.2d at 1335 (internal citations omitted).  *See also Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 42 L. Ed. 2d 477, 95 S. Ct. 449 (1974) (holding that provision of utility service is not a power reserved exclusively to the state).  "[T]he relevant question is not simply whether a private group is serving a 'public function.' "  *Rendell-Baker*, 457 U.S. at 842. Instead, "the question is whether the function performed has been 'traditionally the *exclusive* prerogative of the State.' "  *Id.* (citation omitted) (emphasis in original).  Private schools have

historically been a part of the educational options available in the United States. Education has never been exclusively a government function. *See id.* ("the fact that the school performs a public function in educating maladjusted high school students does not make its acts state action"). Therefore, CCDE's actions do not constitute state action under the public functions test.

### 2. Nexus Test

Plaintiffs argue "that the policies, activities, finances, personnel and corporate structure of Oakstone Academy and Oakstone Community School [("OCS")]. . . are so entwined as to afford them no cognizable individual identities. It is through this nexus with a public entity (OCS) that CCDE acted under color of state law." (ECF No. 54 at 26.) This Court disagrees.

"Under the nexus test, 'the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself.' " *Lansing*, 202 F.3d at 830 (citing *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992)). The case law establish no clear standard for identifying a "sufficiently close nexus." *Id.* Rather, the Supreme Court reminds us that "readily applicable formulae may not be fashioned" for finding state action in civil rights cases; such a finding "can be determined only in the framework of the peculiar facts or circumstances present." *Id.* (quoting *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 726, 6 L. Ed. 2d 45, 81 S. Ct. 856 (1961); *see also Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 939, 73 L. Ed. 2d 482, 102 S. Ct. 2744 (1982) (calling the state action determination a "necessarily fact-bound inquiry"). Although a positive test cannot be adequately formulated in the abstract, both this circuit and the Supreme Court have nevertheless identified some factors

which are decidedly insufficient, by themselves, to justify a finding of a close nexus between the state and a private actor.  *See Lansing*, 202 F.3d at 830.

"Consequently, it is now well-established that state regulation, even when extensive, is not sufficient to justify a finding of a close nexus between the state and the regulated entity." *Id.* (citing as examples, *inter alia*, *Blum, v. Yaretsky*, 457 U.S. 991, 73 L. Ed. 2d 534, 102 S. Ct. 2777 (1982) (refusing to hold New York State responsible for nursing home's patient transfer decisions, "although it is apparent that nursing homes in New York are extensively regulated"); *Crowder v. Conlan*, 740 F.2d 447 (6th Cir. 1984) (holding state was not responsible for private hospital's personnel decisions even if state regulation was "extensive and detailed")).

"Equally well-established is the principle that neither public funding nor private use of public property is enough to establish a close nexus between state and private actors.  *Id.* (citing as examples, *inter alia*,  *Rendell-Baker*, 457 U.S. at 840 (finding private school's personnel decisions not attributable to the state, despite the fact that "virtually all of the school's income was derived from government funding"); *Wolotsky*, 960 F.2d at 1336 (finding private not-for-profit corporation which derived "a significant portion of its funding from the government" and which leased one of its facilities from the government at nominal cost was not a state actor)).

"The minority presence of public officials on the board of a private entity does not render the entity a state actor; nor does the mere approval or acquiescence of the state in private activity." *Id.* at 831 (citing as an example among others *Blum*, 457 U.S. at 1004 ("Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment")).

28

"Finally, the cases indicate that utilization of public services by private actors does not convert private action to state action."  *Id.* (citing as an examples *American Mfg.*, 119 S. Ct. at 987 (holding that "a private party's mere use of the State's dispute resolution machinery, without the 'overt, significant assistance of state officials' cannot [properly be considered state action]"); *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 622, 114 L. Ed. 2d 660, 111 S. Ct. 2077 (1991) ("private use of state-sanctioned private remedies or procedures does not rise, by itself, to the level of state action"); *Ellison v. Garbarino*, 48 F.3d 192, 197 (6th Cir. 1995) (holding that police assistance in lawful exercise of self-help does not convert private action to state action)).

In the case *sub judice*, CCDE cannot be said to have exercised coercive power or provided significant encouragement that the choice must in law be deemed to be that of the state. CCDE's funding, regulatory scheme, use of CEO Morrision for a short time on the board of OCS, or any use of public services are not sufficient to warrant a finding of state action by CCDE.

### 3.  Conclusion Section 1983

The Court concludes that CCDE's actions were not fairly attributable to OCS or to Worthington Schools such that CCDE is subject to liability under Section 1983.  Accordingly, the Court **GRANTS** Defendants' Second Motion for Summary Judgment as it relates to Plaintiffs' Section 1983 claim.

## IV.  Conclusion

Based on the foregoing, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Second Motion for Summary Judgment.  (ECF No. 53.)  Specifically, the Court **GRANTS** Defendants' motion as it relates to Plaintiffs' claims filed under the ADA, Section

1983 and Plaintiffs' punitive damages claim for alleged violations of Section 504 of the

Rehabilitation Act and **DENIES** the motion as it relates to Plaintiffs' claims filed under the

Rehabilitation Act and the availability of compensatory damages for alleged violations of

Section 504 of the Rehabilitation Act.

      **IT IS SO ORDERED.**

                                          **/s/ Gregory L. Frost**
                                          **GREGORY L. FROST**
                                          **UNITED STATES DISTRICT JUDGE**